## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **VS.** ) | |
| ) | **Cause No.  SA-05-CR-639-XR** |
| **DEAN GUTIERREZ** ) | |
| ) | |
| ) | |

## ORDER

Defendant filed a Motion for New Trial based on the prosecution's alleged *Brady* violations and newly discovered evidence. Defendant and the Government ably briefed their respective positions, and the Court held two hearings during which witnesses were called by both sides, exhibits introduced, and vigorous cross-examination conducted. Pursuant to the record before it, and the relationship of the facts to the applicable law, the Court supports Defendant's motion (Docket No. 128) on the basis of both 1) *Brady* violations by the Government and 2) newly discovered evidence. As a result, the Court certifies the Motion to the Court of Appeals for the Fifth Circuit where an appeal of the case is currently pending.

### Factual and Procedural Background

On June 10, 2005, the Defendant, a member of the San Antonio Police Department, picked up Gabriel Bernal ("Bernal") in his police car and drove her to an isolated location.[1] According to Bernal, he made her perform oral sex on him before hitting and then anally raping her. During closing argument, Defendant's trial counsel did not deny that a sexual encounter

---

[1] Bernal is a transgendered person who expressed preference at trial for being referred to in the feminine.

occurred, but argued it was consensual and that no anal sex took place.[2]

After the encounter, Defendant drove Bernal in the front seat of his police car and took her to the Handy Andy store, the place where Bernal requested to be let off. There, Bernal ran into her uncle, Frank Mireles, who happened to be at the same store. Mr. Mireles called 911, informing the operator that Bernal had been raped. The Defendant was arrested, and in August 2006, found guilty by a jury of aggravated sexual abuse. He was thereafter sentenced to the custody of the Bureau of Prisons for a term of 292 months.

On July 6, 2007, almost a year after the conviction and over two years after the alleged crime, the prosecution disclosed a San Antonio Police Department report and an FBI 302 report that it had knowingly possessed since approximately a year before the trial. The SAPD report was prepared in response to an anonymous caller who alleged Bernal was not raped and was bragging that she would receive a lot of money. The FBI 302 report suggests that Carol Lopez, an aunt of Bernal's, made the anonymous call. Special Agent Nava, who interviewed Ms. Lopez and prepared the 302 report, wrote that Ms. Lopez claimed a friend of her daughter's overheard Bernal "talking about receiving money from the City of San Antonio."

The SAPD report was prepared on June 17, 2005, just a week after the alleged rape. The FBI 302 report is dated August 21, 2005, one year before the trial. Despite the fact the prosecution assured defense counsel and the Court at the pre-trial hearing on August 16, 2006 that "we provided the 302s that we have,"[3] the prosecution decided not to turn over the 302 report pertaining to Ms. Lopez because they found her information to neither be relevant nor

---

[2] No evidence, however, was introduced to show consent.

[3] Pretrial Hr'g Tr. 47-8, Aug. 16, 2006.

credible.

In June 2007, Yvonne Trevino, an employee of a mortgage company, overheard Ms. Lopez, a client of the company's, saying that Bernal had a prior relationship with the Defendant, that she fabricated the allegations about the Defendant beating her up, and by implication, that the Defendant did not rape Bernal. Ms. Trevino reported this information both to the FBI and the U.S. Attorney's Office. Pursuant to the receipt of this information, the prosecution issued an advisory to the Court, providing the Court and defense counsel with the 302 report for the first time. The prosecution also provided the anonymous caller SAPD report, although it was soon learned that defense counsel had somehow managed to obtain a copy of it pre-trial.

Shortly, thereafter, Mr. Baumann, the lead AUSA assigned to the case, provided notes to the defense from his conversation in August 2005 with Special Agent Nava concerning her interview that month with Ms. Lopez. Mr. Baumann also turned over his notes from his own conversation with Ms. Lopez in October 2005, at which Special Agent Nava was present. Agent Nava did not prepare an additional 302 report of the October meeting, nor supplement her August 2005 report.

Within one and a half months of receiving the FBI 302 report, defense appellate counsel located and interviewed Ms. Lopez. Although for two years, the Government thought Ms. Lopez was the anonymous caller documented in the SAPD report, defense counsel learned in less than two months that the anonymous caller was actually Yvonne Bernal, Gabriel Bernal's sister-in-law. Yvonne led defense counsel to Rocky Bernal, her husband. Rocky, in turn, led them to Ms. Diana Antu, a neighbor of Rocky and Yvonne's. This chain of witnesses, which came together within one and a half months of the Government's post-trial disclosure of the 302 report,

-3-

possessed information favorable to the Defendant.

Unrelated to the 302 report's disclosure, defense counsel received notification on July 23, 2007 that Mr. Christopher Lyssy, who lived in San Antonio before being incarcerated in Snyder, Texas sometime after the alleged sexual assault, possessed information that Bernal and her longtime boyfriend Mr. Miguel Galan set up the Defendant. Lyssy, who claims to be acquainted with Bernal and Galan from their days together in San Antonio, asserts that the couple told him before the alleged sexual assault that they were going to set up a police officer for money. After the alleged assault, Mr. Lyssy contends that Mr. Galan told him, while the two were serving time together in the Bexar County Jail, that he and Bernal successfully pulled off their plan to set up the Defendant.

As a result of these post-trial discoveries, Defendant filed a Motion for New Trial alleging 1) *Brady* violations, and 2) newly discovered evidence. On August 29, 2007, the Court held a hearing on the motion, during which twelve witnesses testified, including Ms. Lopez, Mr. and Mrs. Rocky and Yvonne Bernal, Ms. Antu, and Mr. Lyssy.

On October 4, 2007, the Court held a second evidentiary hearing on the Motion, this time hearing from five witnesses, including Bernal and Ms. Gloria Rodriguez. Ms. Rodriguez was a member of the public who watched the trial in the courtroom and testified that she overheard Bernal tell her mother not to worry because she was "a good liar" and "going to lie through my teeth . . . to get a lot of money . . . [to] take care of you."[4]

For all the witnesses who testified in both hearings, counsel for both sides were permitted to cross-examine, introduce evidence, and call rebuttal witnesses.

_____

[4] Motion for New Trial Hr'g Tr. 59, Oct. 4, 2007.

**Legal Analysis**

<u>Concise Summary of Burdens of Proof</u>

Defendant contends he is entitled to a new trial on either or both of two grounds: 1) *Brady* violations by the prosecution, and 2) newly discovered evidence.

The standards for considering these two grounds differ. *Brady* requires the Defendant to show a reasonable probability exists that had the evidence been disclosed, the outcome would have been different. For newly discovered evidence, the Defendant must meet the higher standard of showing, amongst other things, that the new evidence will probably produce an acquittal.

<u>*Brady*</u>

<u>Overview of Defendant's *Brady* Claim</u>

Defendant alleges three non-disclosed documents contain information that *Brady* required the prosecution to disclose. These documents are 1) Special Agent Nava's 302 report from her August 2005 conversation with Carol Lopez, 2) Attorney Bill Baumann's August 2005 notes from his conversation with Agent Nava subsequent to her interview with Ms. Lopez, and 3) Mr. Baumann's October 2005 notes from his conversation with Ms. Lopez, during which Agent Nava was present.

To grant the Defendant relief for purported *Brady* violations, the Court must first determine whether the withheld evidence was required to be turned over. The Government argues it was not because of the attorney work product privilege and because the Defendant could have obtained the same information through the exercise of reasonable diligence. If the Court finds the Government did possess a duty to disclose the information, it must then determine whether the undisclosed evidence, and the fruits derived therefrom, are 1) favorable to the Defendant, and 2)

material to the finding of guilt.[5] If both the favorableness and materiality elements are met, a new trial is required.

<u>Purpose of *Brady*</u>

The purpose of *Brady* is to ensure Defendants are afforded fair trials by requiring prosecutors to turn over favorable evidence to the accused. Whether favorable evidence is credible is a decision for the jury as fact finder to make, not the prosecutor. Even well-intentioned prosecutors are less likely to fully explore evidence to see where it may lead, and their position on the case will likely cause them to evaluate a piece of evidence differently than someone whose freedom is at stake.[6] As this case has shown, despite the good faith investigation of the Government to determine the credibility of Ms. Lopez's statements, the defense was able in two months to do what the prosecution and FBI could not do in two years. Although the Government believed for two years that Ms. Lopez placed the anonymous call to the SAPD, the defense quickly learned that Ms. Yvonne Bernal actually made the call. Furthermore, out of their interview with Ms. Lopez, the defense developed a chain of witnesses with favorable evidence to the Defendant that the Government never even considered.

Beyond relevancy and credibility, however, the prosecution contends that it possessed no duty to disclose for two reasons. First, with respect to Mr. Baumann's notes, the prosecution

---

[5] "We now hold that the suppression by the prosecution of evidence **favorable** to an accused . . . violates due process where the evidence is **material** either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963) (emphasis added).

[6] As the Supreme Court observed, prosecutors "simply cannot be asked to maintain . . . neutrality with regard to their own investigations." Coolidge v. New Hampshire, 403 U.S. 443, 450 (1971).

argues the information is protected from disclosure as attorney work product. Second, with the FBI 302 report, the prosecution refers to Fifth Circuit case law and argues the Defendant could have obtained the same information through the exercise of reasonable diligence. The Court addresses each of these arguments in turn.

<u>Mr. Baumann's Notes</u>

The parties contest whether Mr. Baumann's notes concerning the Government's August and October 2005 interviews with Ms. Lopez are required to be disclosed under *Brady*.

Just because information is written by an attorney or kept in his file does not necessarily make it privileged. As the Supreme Court held in *Hickman v. Taylor*, "where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had."[7]

Such a holding is particularly applicable when the information does not pertain to attorney opinions or legal theories, but merely recounts such factual information as what a potential witness said during the course of a pre-trial interview. Indeed, the Fifth Circuit in *Dickson v. Quartermen* "express[ed] . . . concern regarding the State's failure to turn over pretrial interview statements" by two witnesses.[8] As the court reasoned, "Although the trial prosecutor apparently believed these recordings were protected work product, these recorded pretrial interview statements contain no protected attorney opinion."[9]

In this case, the disputed notes contain selected statements by Ms. Lopez recorded by Mr.

---

[7] 329 U.S. 495, 511 (1947).

[8] 462 F.3d 470, 479 (5th Cir. 2006).

[9] *Id*.

Baumann. These notes involve some level of attorney discretion or interpretation, unlike the taped recordings in *Dickson*. At the same time, Baumann's notes and the tapes in *Dickson* are similar because both exist for the purpose of factually recounting the information provided by a potential witness from a pre-trial interview. Mr. Baumann's August 2005 notes lay out the highlights of what Agent Nava conveyed from her interview with Ms. Lopez, and the October 2005 notes relate what Ms. Lopez told Mr. Baumann directly during their interview.

As the *Dickson* court observed, "the Supreme Court has not decided whether Brady requires a prosecutor to turn over his work product."[10] Although the *Dickson* court also does not resolve the issue, it does quote Charles Alan Wright's Federal Practice and Procedure, which states, "Because *Brady* is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within *Brady*."[11]

Defendant argues that all he seeks are the statements Ms. Lopez made and any exculpatory facts contained in the notes. Defendant contends such information is not protected work product. Even if the Court were to find that it is, however, Defendant argues the constitutional obligations of *Brady* prevail over the court-created doctrine promulgated in the Federal Rules. Indeed, in *U.S. v. Sipe*, the Fifth Circuit held that suppression of a prosecution memorandum containing witness statements was *Brady* error, with no suggestion that the memo

---

[10] *Id.* at n. 7.

[11] *Id.* (citing 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 254.2 (3rd ed. 2000).

was protected by the attorney work product privilege.[12]

At the very least, the prosecution should have disclosed the content of the favorable evidence contained in Mr. Baumann's notes. The notes are no more than a recap of what a potential witness said during two different interviews. Had the interviews been taped, the tape recordings would clearly be subject to *Brady* disclosure requirements. It does not make sense to provide a prosecutor with an escape from his constitutional duties merely because he chose to record what was said through note-taking rather than an audio tape.

The statements made by Ms. Lopez need not have been admissible to be discoverable. They need only have been reasonably expected to lead to admissible evidence, which time has proven to be the case.[13] Thus, the prosecution clearly had a *Brady* duty to at least disclose the pertinent content of the notes, even if they did not turn over the notes themselves.

Thus, the identity of Ms. Lopez, along with any favorable statements to the defense made by her, should have been disclosed. Such statements from the August 2005 notes include, "Frankie takes him places to do his thing," "Gabriel is a very good liar," "When you meet him you think he's telling the truth, but he's lying," and "Someone else said he said he's going to buy a house, get a lot of money." Statements from the October 2005 notes that should have been disclosed include that Ms. Lopez denied being the anonymous caller to the SAPD and that

---

[12] 388 F.3d 471 (5th Cir. 2004). Like in this case, the interviewee's statements were written down by the prosecutor himself. Unlike here, the Government alleged "that the statement in the Prosecution Memorandum was an inarticulate statement of the drafting attorney's impressions of [the interviewee]." *Id*. at 481. The trial court disagreed, and on appeal, the Government did not challenge the trial court's finding.

[13] "Evidence may be material under *Brady* even though it is inadmissible . . . We often consider whether the suppressed, inadmissible evidence would have led to admissible evidence." *Id*. at 485.

Gabriel told her she was "going to put a sue on the city."

Only through disclosure of the pertinent content in the notes could Defendant probe at trial the omissions between Agent Nava's 302 report and what she reported to Mr. Baumann. For example, Agent Nava failed to include in her report that according to Ms. Lopez, Frank Mireles, the uncle who happened to be at the Handy Andy parking lot when the Defendant dropped Bernal off there, takes Bernal "places to do his thing." Agent Nava's report also omitted that Ms. Lopez claimed "Gabriel is a very good liar" and that "when you meet him, you think he's telling the truth, but he's lying," even though she provided these statements to Mr. Baumann in their off the record conversation. Finally, even after Agent Nava and Mr. Baumann re-interviewed Ms. Lopez two months later, Agent Nava did not file a new 302 report or supplement the old one, despite the fact Lopez revealed such noteworthy information as her denial of being the anonymous caller (suggesting another family member made the call and possessed information favorable to the Defendant) and that Bernal planned to "put a sue on the city."

*Brady* is a constitutional doctrine that exists to ensure prosecutors turn over potentially favorable information to the defense in furtherance of their obligation to ensure that "justice shall be done."[14] Here, the prosecutors possessed favorable information to the Defendant, but they deliberately chose not to disclose it until long after the jury reached its verdict. Even though the information was stored in the form of a prosecutor's notes, the notes are essentially nothing more than a recitation of what the interviewee said during her two interviews. As such, the potential harm to the Government in turning over the notes was slight, but the potential gain to the Defendant, whose freedom was at stake and who could have learned much through those notes

---

[14] *Dickson*, 462 F.3d at 479.

that would have aided his defense, was great. Accordingly, the Court finds that the pertinent content described above in Mr. Baumann's notes was subject to *Brady*'s disclosure requirements and should have been disclosed pre-trial.

Reasonable Diligence

The Government next contends that it had no duty to disclose the FBI 302 report because the information contained therein could have been obtained by the Defendant through the exercise of reasonable diligence. As the Fifth Circuit has held, "the State bears no responsibility to direct the defense toward potentially exculpatory evidence that is either known to the defendant or that could be discovered through the exercise of reasonable diligence."[15] The issue, therefore, becomes what the Court in this case should expect the Defendant to have discovered pursuant to a reasonably diligent investigation.

This inquiry is complicated by the fact defense counsel obtained pre-trial a copy of the SAPD report from June 2005 documenting information provided by an anonymous caller. The report states the unnamed caller is related to Gabriel Bernal and that "she has heard Gabriel bragging about what happened to him." The report also quotes the caller as alleging, "Gabriel is saying and telling everyone in his family that he is going to get a lot of money from the city."

Because defense counsel received this report, they knew or should have known that a relative of the alleged victim potentially possessed information favorable to the Defendant. What they did not know, and what the FBI 302 report would have told them, is who the anonymous caller purportedly was. As the Government has candidly acknowledged, Ms. Lopez, the suspected caller, "was part of a fairly large extended family that included Bernal's sisters,

---

[15] *Sipe*, 388 F.3d at 478.

brother, uncle, aunt, and mother."[16] Even so, the Government argues that reasonable diligence required defense counsel to spend valuable pre-trial time and resources tracking down relatives in an admittedly large and extended family in the hope of finding a relative of the victim who both knew information unfavorable to the victim and who, despite calling the police anonymously, would be willing to openly testify against the victim in front of the rest of the family.

Black's Law Dictionary defines reasonable diligence as "a fair degree of diligence expected from someone of ordinary prudence under circumstances like those at issue."[17] Applying the definition to the facts of this case, the question is whether an ordinary defense counsel would devote trial preparation time and resources to interviewing the large and extended family of the alleged victim, many of whose members are openly hostile to his client, until he ascertains the identity of a purported, but unconfirmed, relative who called the police anonymously? While some defense attorneys would embark on such an adventure, many would not. The Court rejects the argument that an ordinary attorney, in these circumstances and without the aid of the 302 report, would have pieced together the chain of evidence that the Defendant assembled post-trial. The Court finds that the Defendant's inability to learn what the Government intentionally withheld did not result from a lack of reasonably diligent investigation on his part. Rather, it resulted from the failure of the prosecution to carry out their constitutional duties to disclose information required by *Brady*.

In sum, it was the prosecution, not the defense, who had reason to build relationships with

---

[16] Government's Post Evidentiary Hearing Brief in Support of the Denial of Defendant's Motion for New Trial at 7.

[17] BLACK'S LAW DICTIONARY 489 (8th ed. 2004).

the alleged victim and her sizable family. It was through those relationships that the prosecution

identified Carol Lopez. Notably, even though the prosecution had more cause to build

relationships with the victim's family, and even though the prosecution benefitted from the

investigatory assistance of highly trained FBI special agents, they still were unable to correctly

ascertain the identity of the anonymous caller. Therefore, for the Government to now say they

had no duty to disclose the 302 report because, working solely off the SAPD anonymous caller

report, the Defendant, by merely exercising reasonable diligence, could have tracked down the

caller and obtained all the same information as the Government possessed conflicts with the

purpose of *Brady* and is an unreasonable extension of the meaning of reasonable diligence.

Accordingly, the Court finds that the prosecution had a constitutional duty to disclose the FBI

302 report, which it failed to do.

Favorable

Having found the prosecution possessed a duty to disclose the FBI 302 report and Mr.

Baumann's notes, the Court now considers whether the failure to do so demands a new trial.

Under *Brady* and its progeny, a failure to disclose evidence requires a new trial when the

undisclosed evidence, including the fruits derived therefrom, is favorable to the Defendant and

material to the finding of guilt. The Court turns first to the favorableness requirement.

Both exculpatory and impeachment evidence qualify as favorable evidence.[18] It is clear

that the statements made by Carol Lopez would have assisted the Defendant in impeaching the

credibility of Gabriel Bernal, the key witness for the prosecution, by calling into question her

---

[18] "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." U.S. v. Bagley, 473 U.S. 667, 676 (1985).

version of whether the sexual encounter was consensual. In addition to their stand alone value, the statements would have prompted defense counsel to engage in further investigation that would have resulted in the discovery of additional favorable evidence. As the facts reveal, once the 302 report and Mr. Baumann's notes were turned over to the Defendant, the defense team quickly connected a chain of witnesses who possessed important impeaching and exculpatory knowledge favorable to their client. These witnesses, which include Carol Lopez, Yvonne Bernal, Rocky Bernal, and Diana Antu, all challenge or in some way discredit the Government's rendition of what happened between Bernal and the Defendant.

Therefore, the undisclosed evidence is favorable to the Defendant.

Material

Once favorableness is shown, the inquiry turns to whether the undisclosed evidence and its fruits materially affected the verdict. In *U.S. v. Bagley*, the Supreme Court defined "material" to mean "there is a **reasonable probability** that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[19] The "reasonable probability" standard does not require the Defendant to prove "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."[20] Indeed, "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a

_____

[19] 473 U.S. at 682 (emphasis added).

[20] Youngblood v. West Virginia, 126 S.Ct. 2188, 2190 (2006) (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

verdict worthy of confidence."[21] The Defendant meets this standard when he can show that the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"[22]

In determining whether the Court's "confidence in the outcome of the trial" has been undermined, it is important to remember that at trial, the credibility of a key witness could make the difference in the Defendant's fate. As the Court noted in *Bagley*, "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[23]

The FBI 302 report and Mr. Baumann's notes, when considered cumulatively with all the evidence derived therefrom,[24] seriously discredit Gabriel Bernal, the prosecution's essential key witness, and undermine confidence in the trial verdict. Specifically, the documents lead to the discovery of a chain of people with knowledge of impeaching and exculpatory evidence

---

[21] *Kyles*, 514 U.S. at 434.

[22] *Id.*

[23] *Bagley*, 473 U.S. at 676 (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)). Gabriel Bernal was the prosecution's key witness. He was the only person the prosecution could call to testify whether the sexual encounter with the Defendant was consensual or not. The withheld statements and the fruits of those statements strongly suggest that had the necessary disclosures been made before trial, the Defendant could more persuasively have presented evidence showing a "possible interest of the witness in testifying falsely" about whether the sexual activity was consensual.

[24] When there are multiple "alleged *Brady* violations at issue, we must determine whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result." *Sipe*, 388 F.3d at 484.

In so doing, "we often consider whether the suppressed, inadmissible evidence would have led to admissible evidence." *Id*. at 485. By the same logic, the Court should also consider whether the suppressed admissible evidence, such as that found here, would have led to the discovery of additional admissible evidence.

-15-

favorable to the Defendant such as to create a "reasonable probability that, had the evidence been disclosed to the defense," the jury would have had a reasonable doubt as to the Defendant's guilt, meaning "the result of the proceeding would have been different."[25]

To begin, the information led Defendant to Carol Lopez, the suspected anonymous caller from the SAPD report. After interviewing Ms. Lopez, the defense team realized that Yvonne Bernal, the sister-in-law of Gabriel Bernal, actually made the anonymous call. After interviewing Yvonne, defense counsel learned that Rocky Bernal, Yvonne's husband and Gabriel's brother, possessed relevant information favorable to the Defendant. Rocky, in turn, led the defense to Diana Antu, a disinterested neighbor of Rocky and Yvonne's who knew pertinent information about Gabriel Bernal's demeanor and verbal expressions after the alleged sexual assault.

How and to what these witnesses would testify has been demonstrated through the proceedings to date, including the August 29, 2007 hearing. Ms. Lopez would state that Gabriel intended "to put a sue on the city"[26] and that she is a "very good liar" whom you think is telling the truth, but is not.[27]

---

[25] *Bagley*, 473 U.S. at 682.  The reason the Court can be so certain that the disclosures would have led to this chain of people with evidence favorable to the Defendant is that such a chain was actually constructed in less than two months after the disclosures were made.

[26] Mr. Baumann's October 2005 Notes. Closely associated with Bernal's general credibility is her motivation to fabricate for money the story about the sexual assault. At trial, she admitted to hiring a lawyer to pursue a civil case, but downplayed the issue of money. She testified that she hired a lawyer to protect her rights and that the issue of money was first brought up by her attorney. Ms. Lopez's testimony, however, indicates Bernal had money on the forefront of her mind, as does the testimony of other new witnesses, including Diana Antu, Gloria Rodriguez, and Christopher Lyssy.

[27] Mr. Baumann's August 2005 Notes. Attacking Bernal's credibility was a key component of Defendant's trial strategy. Given the DNA evidence, the defense could not deny that a sexual act occurred. In closing argument, defense counsel acknowledged that a consensual oral sex act occurred, but denied that any anal sex act occurred and denied that Gutierrez was guilty of

Yvonne Bernal would acknowledge that she made the anonymous call to the SAPD because she was concerned that Gabriel was not telling the truth about what happened with the Defendant. Yvonne would assert that based on her conversations with Gabriel, it is her impression that Gabriel has a history of police officers trying to pick her up for sexual encounters. As for the night of the alleged rape, Yvonne would testify that Laura Mireles, Gabriel's sister, told her that someone else had beaten up Gabriel and "made it look like the police officer did [it]."[28]

On the stand, Rocky Bernal might not always be clear, but what would eventually come through is that one of his sisters told him they "set this cop up" and that Miguel Galan and two of Rocky and Gabriel's sisters were present when some or all of them beat up Gabriel to make it look like the Defendant did it.[29] Rocky would also testify that Gabriel stated to him that she set

─────────────────────

aggravated sexual abuse. Thus, in determining what took place and whether it was consensual, Bernal's credibility is the touchstone consideration. The fact that Carol Lopez, a family member of Bernal's, thought she was a "very good liar" and that "when you meet him, you think he's telling the truth, but he's lying" cuts sharply at Bernal's credibility, much more so than what Defendant's counsel could do at trial with the limited evidence then in their possession or with the police officer character witnesses they called to opine on Bernal's reputation for truthfulness in the community. Of course, the prosecution could attempt to discredit Ms. Lopez on cross-examination, but at least her testimony would reach the jury, who could then make its own factual evaluation of the credibility and weight to be assigned to Ms. Lopez's remarks.

On a related note, defense counsel argues that at trial, the prosecution tried to mitigate the impact of Bernal's lie to the police about where her uncle was at when the Defendant dropped her off at the Handy Andy by saying Bernal was under a lot of pressure, and it was this pressure that explains the fabrication. In other words, don't read too much into this one little lie because the rest of the story is credible. Ms. Lopez's statement, coming from a family member who has known Bernal all her life, that Bernal is a "very good liar" challenges the Government's duress argument and calls into question whether the lie about the uncle was an aberration in Bernal's credibility or the norm.

[28]  Motion for New Trial Hr'g Tr. 109, Aug. 29, 2007.

[29]  *Id*. at 75-6.

the officer up to file a lawsuit and get money.[30]

Finally, Diana Antu would describe how before the trial, but after the alleged rape, she heard Gabriel in front of her house laughing about the incident and talking about how "he was going to get all of this money to help his family."[31] On the money, Ms. Antu heard Gabriel say it would come from "off of that officer" and that "he was going to do what he was going to do to get it."[32]

When all of this testimony and evidence is viewed cumulatively, as must be done, enough doubt is engendered as to the credibility of the Government's essential key witness that there is a "reasonable probability that, had the evidence been disclosed to the defense," the jury would have had a reasonable doubt as to the Defendant's guilt.[33]

Conclusion - *Brady*

When the evidence is viewed cumulatively, as must be done in *Brady* cases, the undisclosed information, coupled with the fruits derived therefrom, causes to germinate a reasonable doubt as to the Defendant's guilt. This cause for doubt exceeds the "reasonable probability"standard adopted by the Supreme Court and Fifth Circuit, meriting a new trial.[34]

---

[30] *Id*. at 77-8, 87-8.

[31] *Id*. at 56 and 70.

[32] *Id* at 59.

[33] *Bagley*,  473 U.S. at 682.

[34] Like in *Sipe*, when the evidence here is "considered cumulatively, its potential impact on the outcome of the trial is too strong, especially given the other evidence in the record undermining the government's case. The cumulative effect of this evidence raises a reasonable probability that its disclosure would have produced a different result." 388 F.3d at 491-2.

<u>Newly Discovered Evidence</u>

<u>Overview of Defendant's Newly Discovered Evidence Claim</u>

Defendant's alternative, independent ground for a new trial is based on newly discovered evidence. Motions for new trials based on newly discovered evidence are "disfavored by the courts and therefore are viewed with great caution."[35] Accordingly, this Court approaches the arguments presented by the Defendant with appropriate reservation. Although the Court should view the arguments with reservation, it must grant a new trial "if the interest of justice so requires."[36]

Guiding the court's determination of whether "the interest of justice" requires a new trial is a four point test set forth by the Fifth Circuit. Known as the *Berry* test, in reference to the 1851 Georgia Supreme Court decision from which it is drawn,[37] it requires that the Defendant prove four elements. His "failure to satisfy one part of this test requires denial of the motion for new trial."[38]

The four elements the Defendant must show are:

"1) that the evidence is newly discovered and was unknown to him at the time of trial;

2) that the failure to discover the evidence was not due to his lack of diligence;

3) that the evidence is not merely cumulative, but is material; and

---

[35] U.S. v. Fowler, 735 F.2d 823, 830 (5th Cir. 1984).

[36] FED. R. CRIM. P. 33(a).

[37] Berry v. State, 10 Ga. 511 (1851).

[38] U.S. v. Pena, 949 F.2d 751, 758 (5th Cir. 1991).

4) that the evidence would probably produce an acquittal."[39]

Both parties agree what the law is. Their primary disagreement is how to assess the facts. They contest how much weight a certain witness's testimony should receive, or whether witness A is more credible than witness B. If Defendant's assessment of the facts and the weight to be accorded them is adopted, there can be little doubt that the four-step *Berry* test will require a new trial. Conversely, if the Government's view of the credibility and weight of the respective facts is favored, it is clear that the application of the *Berry* test will preclude a new trial. For all the complexities of this case and for all the testimony the Court has heard, the Court's decision on whether to grant a new trial primarily boils down to a credibility assessment of the facts. While the *Berry* test presents mixed issues of law and fact because the Court must apply the relevant legal prongs to the facts, how the Court weighs the evidence before it is largely determinative, given the unique nature of this case, of whether the Defendant meets the standard for a new trial.

Evidence Is Newly Discovered

There is no serious dispute that the testimony of Chris Lyssy is newly discovered and was unknown to the Defendant at the time of trial. Neither party knew of his existence until after trial, much less that he possessed information relevant to the case. His identity first became known through a letter from a third party sent to defense counsel in July 2007, almost a year after the trial. His testimony concerning a plot to set up the Defendant provided evidence not known before trial.

Failure to Discover Evidence Was Not Because of Lack of Diligence

Neither the identity of Mr. Lyssy, nor the content of his testimony, was known to either

---

[39] U.S. v. Blackthorne, 378 F.3d 449, 452 (5th Cir. 2004).

the Defendant or the Government before trial. Mr. Lyssy was neither related to, nor in any way directly acquainted with, the Defendant. At the time of trial, he was incarcerated, and his identity only became known to the parties approximately a year later. Short of rounding up every friend or acquaintance of Bernal's and Galan's, including visiting every incarcerated inmate in the state who knew these two people, followed by probing these acquaintances about whether they possessed evidence favorable to the Defendant, it seems highly unlikely Defendant could have learned of the identity and testimony of Christopher Lyssy before trial.

Accordingly, no exercise of reasonable diligence by Defendant could have alerted him to the existence of this witness or to the information he possessed.

Evidence Is Material

The testimony of Mr. Lyssy is material, not merely cumulative or impeaching. It establishes an alternative theory of the case, namely that Bernal set up the Defendant to sue the city and make money for himself and his family. While such testimony impeaches the credibility of the purported victim, it goes much further. It provides a plausible defense, which if believed, would require a verdict of not guilty. In short, the newly discovered evidence goes to the heart of guilt or innocence, and accordingly, is material.

There is no dispute that a sexual encounter occurred between Bernal and the Defendant. What is very much in dispute is whether this encounter was consensual. Bernal alleges it was not. Guilt or innocence turns on whether the jury believes the encounter was consensual. The new evidence, if believed, supports Defendant's view on consent, and as such, is material to the case.

At trial, Defendant attacked Bernal's believability, attempting to reveal her mendacious character. Defendant worked with the evidence then before him, trying to show that the alleged

victim had consulted a civil attorney to discuss money damages and had a reputation for untruthfulness. While attacking the alleged victim's credibility, and thus indirectly calling into question her credibility as to consent, the Defendant could not directly challenge the alleged victim's testimony on consent because he lacked the evidence with which to do so.

Post-trial, however, such evidence came to light, and as already shown, its revelation was unrelated to Defendant's diligent attempts to procure it pre-trial. The newly discovered evidence directly contradicts Bernal's version of the story. The new evidence provides the Defendant with the arsenal to squarely contest the issue of consent and show that Bernal set him up in order to sue the city and receive money. Such evidence was sparse at trial, and thus, Defendant could only weakly attack the victim's version of events. With the newly discovered evidence, which comes from a witness the Court finds to be credible and disinterested, Defendant can now materially challenge the Government's story, providing the jury with a plausible version of the case which, if the jury accepts, would lead to an acquittal.[40]

As a final matter, the newly discovered evidence would be admissible at trial. Mr. Lyssy's testimony would be admissible to discredit the testimony of Bernal, to opine on her general reputation for dishonesty, to show her then-existing mental condition, and to prove with extrinsic

---

[40] While the Court, looking only at Mr. Lyssy's testimony, finds that it is material, it believes Mr. Lyssy's testimony is even more potent when combined with the testimony of other post-trial witnesses such as Diana Antu, Gloria Rodriguez, Yvonne Bernal, and Rocky Bernal. Still, while these other witnesses, all of whom testified for the first time post-trial, bolster the credibility of the Defendant's argument that he was set up, it is Mr. Lyssy's testimony that anchors the defense. Mr. Lyssy testified that Gabriel Bernal and Miguel Galan told him about the setup of the Defendant before it happened and that Mr. Galan confirmed to him afterwards that the setup succeeded.

evidence her bias.[41]

For the reasons stated herein, the newly discovered evidence is material.

<u>Evidence Would Probably Produce an Acquittal</u>

In reviewing the newly discovered evidence, the Court has considered it cumulatively with the rest of the record before it. In most cases, the new evidence will impeach the convicting evidence, but will not cast serious doubt on the outcome. Here, where the prior verdict turned on consent, and the evidence of non-consent boiled down to the testimony of one witness, the issue of credibility takes on critical significance. As the Supreme Court has stated, "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[42]

The newly discovered evidence casts serious doubt on the essential testimony of the alleged victim, whose credibility is further challenged by much of the evidence and testimony produced at the post-trial hearings. Even more importantly, the new evidence offers a plausible alternative to the story proffered by the Government. Because the new evidence seriously undermines the Government's key witness, on whose account the conviction rests, and provides a plausible alternative to the event in question, an alternative strongly supported by the testimony of members of the victim's own family, in addition to Ms. Antu and Ms. Rodriguez, it is highly probable that a new jury will have at least a reasonable doubt as to the Defendant's guilt. Because

---

[41] *See* FED. R. EVID. 608(a), 613(a), 613(b),  803(3), and U.S. v. Abel, 469 U.S. 45, 50-2 (1984).

[42] *Bagley*, 473 U.S. at 676.

-23-

a reasonable doubt requires a finding of not guilty, the newly discovered evidence will "probably produce an acquittal."[43]

The newly discovered evidence comes in the form of testimony by Mr. Lyssy. What is especially notable about this witnesses is that, unlike almost every other person who has provided substantive testimony, he has no interest in the outcome of this case. Moreover, not only does he not have an interest, testifying against the purported victim is explicitly against his interests.[44]

Additionally, Mr. Lyssy's testimony supports and is supported by the testimony of other witnesses, providing context for his assertions and bolstering the believability of the evidence. Finally, the demeanor, presentation, and candor of Mr. Lyssy while testifying struck the Court as suggestive of a person providing honest testimony. On a day in which twelve witnesses took the stand, his testimony, along with that of Ms. Antu's, stood out for the responsiveness of the answers and the apparent genuineness of the statements.

Mr. Lyssy, like other witnesses, was concerned about his safety for testifying on behalf of the defense.[45] As he put it, if the other inmates discovered he was testifying for a cop, he could

---

[43] *Blackthorne*, 378 F.3d at 452.

[44] Despite the lapse of over a month between Mr. Lyssy's testimony on August 29 and the next hearing on October 4, the Government produced no evidence nor made any arguments related to a possible motivation for Mr. Lyssy not to tell the truth.

[45] For example, when asked whether she wanted to testify, Ms. Antu unreservedly said "no." Motion for New Trial Hr'g Tr. 57, Aug. 29, 2007. When asked why, she replied she was afraid, having seen what the Bernal family does to one another. As the sole caretaker of her grand boys, she feared what might happen if she took the stand against Gabriel Bernal. *Id*.
Rocky and Yvonne Bernal also testified they did not wish to be witnesses in this case. Rocky knew that if he testified, he would be arrested for an outstanding warrant as soon as he left the stand (which he was), and Yvonne stated she was reluctant to testify because she "didn't want [her] family harmed." *Id*. at 128.

get in trouble, "in other words . . . beat up."[46] Mr. Lyssy had nothing to gain, but something to lose from testifying.

Mr. Lyssy's testimony is further bolstered by its consistency with the testimony of other witnesses. Mr. Lyssy described how prior to June 10, 2005, Gabriel Bernal told him that she had engaged in consensual sexual relationships with San Antonio police officers.[47] This assertion is supported by the testimony of Yvonne Bernal, Gabriel's sister-in-law. Yvonne Bernal acknowledged that it was her impression from Gabriel's remarks to her that she had sexual relations with more police officers than just the Defendant.[48]

Mr. Lyssy also testified that Gabriel Bernal and Miguel Galan told him prior to the date of the alleged sexual assault that they were going to set up a cop to get money. Specifically, they planned for Gabriel to have sex with the cop, after which, Miguel would beat her up to make it look like the police officer did it.[49] Again, Lyssy's testimony is supported by Yvonne Bernal, who said that Laura Mireles, Gabriel's sister, told her that someone else beat up Gabriel to make it look like the Defendant did it.[50] Rocky Bernal also testified that one of his sisters told him, "they set this cop up," and that Laura Mireles, Sandy Bernal [another sister], and Miguel Galan beat up Gabriel.[51]

---

[46] *Id.* at 182.

[47] *Id*. at 150-1.

[48] *Id*. at 109-10.

[49] *Id*. at 150.

[50] *Id*. at 108-9.

[51] *Id*. at 75-6.

Lyssy further testified that after the staged beating, Gabriel and Miguel planned to call 911 and allege rape. As it turned out, Frank Mireles, Gabriel's uncle, would be the one to call 911. How Mr. Mireles happened to be at the Handy Andy where Gabriel was dropped off by the Defendant remains disputed. After all, it was Bernal who chose the Handy Andy parking lot, where Mr. Mireles already happened to be.[52] Initially, Bernal and Mr. Mireles lied to the police about Mireles' whereabouts, asserting he arrived at the Handy Andy only after Bernal called him. According to Bernal, she lied about her uncle's presence because he had diabetes and did not want to become involved in a police investigation, although it was he who made the initial 911 call, and in that call, he provided the 911 dispatchers with his own name.

Lyssy testified that after the alleged sexual assault had occurred, Miguel Galan told him that he and Bernal had succeeded in setting up the Defendant. When asked where Mr. Galan told him this information, Lyssy responded that the two discussed it during their joint period of confinement in the Bexar County Jail.[53] As the jail's records reflect, the two were incarcerated with only one cell between them from July 26 through July 29, 2005, approximately a month and

---

[52] The Defendant allowed Bernal to sit in the front seat of his police car and asked her where she wished to be dropped off, strange behavior from someone who allegedly just sexually assaulted her.

[53] The Court ordered Miguel Galan to appear for testimony. His whereabouts, however, could not be discovered, although it seems perfectly clear from her testimony that Bernal knew where to find him. Motion for New Trial Hr'g Tr. 24-5, Oct. 4, 2007.
Even though Bernal knew Galan was ordered to testify, and even though Bernal knew Galan's testimony was crucial for evaluating the credibility of her version of the facts - a central issue in the post-trial proceedings - Bernal intentionally refused to assist the Government in locating Galan. This is especially troubling given 1) the fact that Galan and Lyssy served time together shortly after the alleged rape, 2) Lyssy's assertions about what Galan told him in jail, and 3) Galan's November 1, 2005 statement to police, previously excluded as too speculative, that he believed that the "sex between [Bernal] and Officer Gutierrez had been consensual."

a half after the encounter between Bernal and the Defendant.[54] Additionally, they were housed in the same unit from September 13 through September 22, 2005.[55]

According to Mr. Lyssy, the setup was "about the money."[56] The testimony of at least two other witnesses supports this assertion. According to Ms. Antu, after the alleged rape, Bernal was laughing with people and talking about how she was going to get all of this money "off of that officer."[57] Additionally, during the trial, an unaffiliated member of the public overheard Bernal tell her mother, "Don't worry, mom. I am a good liar. I am going to lie through my teeth, and I am going to get a lot of money, and I will take care of you."[58]

In sum, Mr. Lyssy provides believable testimony that 1) Bernal and Galan told him they planned to set up a cop for rape before the incident with the Defendant occurred, 2) the purpose of the setup was to get money, and 3) after the alleged rape occurred, Galan told Lyssy that he and Bernal had successfully set up the Defendant.

This testimony provides a plausible framework in which to view the evidence in the case. This framework is supported and built upon by the testimony of other witnesses, including Ms. Antu, Ms. Rodriguez, Rocky Bernal, and Yvonne Bernal. The alternative theory of the case rests

---

[54] *Id*. at 50 and 84, Oct. 4, 2007.

[55] *Id*. at 84.

[56] Motion for New Trial Hr'g Tr. 151, Aug. 29, 2007.

[57] *Id*. at 59.

[58] Motion for New Trial Hr'g Tr. 59, Oct. 4, 2007. This statement was not offered by Defendant as newly discovered evidence because Defendant's trial counsel were aware of this statement at trial, but unfortunately chose not to make the Court aware or request that the person be permitted to testify.

on the testimony of Gabriel Bernal, a person whose credibility has seriously been undermined by not only her own relatives, but by unaffiliated witnesses like Ms. Antu and Ms. Rodriguez. Neither version of what happened between Bernal and the Defendant is perfect, and both have missing or apparently conflicting pieces. When presented with all the evidence, however, a high probability exists that a jury will have at least a reasonable doubt as to the Defendant's guilt. As a result, the Court finds that the newly discovered evidence will "probably produce an acquittal."[59]

Conclusion - Newly Discovered Evidence

The Court finds that the Defendant successfully meets all four prongs of the Fifth Circuit's *Berry* test. Accordingly, the Court holds the newly discovered evidence requires a new trial.

## Conclusion

The facts in this case are not pretty. A police officer admittedly performed a sex act while on duty and in the public streets. The question, however, is whether he violated Bernal's civil rights by committing aggravated sexual abuse.

This case presents the very rare situation in which a Defendant convicted of a crime meets the high hurdles imposed for a new trial. Having surpassed these hurdles, the Court finds the Defendant merits a new trial on both *Brady* and newly discovered evidence grounds. "Although a district court may not grant a motion for a new trial based on newly discovered evidence if an appeal is pending . . . it does, nevertheless, have jurisdiction to entertain the motion and . . . certify its intention to grant the motion to the Court of Appeals, which could then

---

[59] *Blackthorne*, 378 F.3d at 452.

entertain a motion to remand the case."[60] Accordingly, the Court certifies the motion to the Court of Appeals for the Fifth Circuit, with the recommendation that the proper procedural steps be taken to grant the Defendant a new trial.

It is so ORDERED.

SIGNED this 16th day of October, 2007.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[60] U.S. v. Redd, 355 F.3d 866, 880 (5th Cir. 2003).